## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KAY TRAMMELL, ) | |
| ) | No. 12 CV 6780 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner, Social Security ) | |
| Administration, [1] ) | |
| ) | March 25, 2014 |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

Kay Trammell claims that she is unable to work because of knee, back, hip, and arm pain stemming from osteoarthritis. She sought disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, but her application was denied in a final decision by the Commissioner of the Social Security Administration. Trammell filed this appeal from that decision, *see* 42 U.S.C. § 405(g), and currently before the court are the parties' cross motions for summary judgment. For the following reasons, the Commissioner's motion for summary judgment is granted and Trammell's is denied:

### Procedural History

Trammell applied for a period of disability and DIB on July 31, 2009, claiming that she became unable to work on July 10, 2009. (Administrative Record

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

("A.R.") 77, 188.) After her claims were denied initially and upon reconsideration, (id. at 94-99), Trammell sought and was granted a hearing before an administrative law judge ("ALJ"). The ALJ initiated a hearing on August 20, 2010, and explained to Trammell her right to representation. (Id. at 63-65.) When Trammell said that she would like to pursue representation, the ALJ adjourned the hearing until February 15, 2011. Trammell retained an attorney who represented her at the new hearing, at which she testified. (Id. at 18-58.) On March 8, 2011, the ALJ issued a decision finding that Trammell is not disabled within the meaning of the Social Security Act and denying her DIB claim. (Id. at 77-85.) When the Appeals Council denied Trammell's request for review, (id. at 1-3), the ALJ's denial of benefits became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). On August 23, 2012, Trammell filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c); (R. 10).

## Facts

In July 2009 Trammell was let go from her job as a data entry specialist for Merrill Lynch Brokerage. (A.R. 28-29, 31, 267.) Shortly after she lost her job, Trammell applied for DIB, claiming that arthritis-related pain in her back, knees, hips, and arms prevented her from working. (Id. at 188-94.) Trammell, who was 64 years old when she stopped working, presented both testimonial and documentary evidence at her February 2011 hearing.

**A.     Medical Evidence**

Trammell's documentary evidence shows that in February and March 2009 she sought emergency treatment for intermittent discomfort in her left arm.  (A.R. 306-08.)  In the wake of those visits Trammell's treating physician, Dr. Rosenberg, ordered radiology tests for her chest, shoulder, and back.  The results showed a normal heart but degenerative changes around Trammell's left shoulder and back, with some narrowing in her intervertebral disc space with osteophyte formation. (Id. at 299-301.)  In August 2009, the month after she lost her job, Trammell reported to Dr. Rosenberg that her knees "bother her," but Dr. Rosenberg wrote "negative" in her "problem list" with respect to Trammell's neck and extremities. (Id. at 327.)  Because she had complained of chest pain and had a history of left arm pain, Dr. Rosenberg referred Trammell for cardiac nuclear imaging, which resulted in normal findings.  (Id. at 326.)

In October 2009 a consulting physician, Dr. Patil, performed an internal medicine consultative examination at the request of the state disability determination services office.  (Id. at 369-372.)  Trammell reported to Dr. Patil that the pain in her left knee was at the level of nine out of ten, but she had no complaints with respect to her other joints.  (Id. at 369.)  He noted that she was moderately obese (her BMI was greater than 38), but walked with a normal gait. (Id. at 370, 372.)  Dr. Patil examined Trammell and noted that there were no obvious deformities of her spine and she did not show any paravertebral tenderness. (Id. at 371.)  He rated her motor strength as 5/5 in her upper and lower extremities

and found her fine and gross manipulative abilities in her hands and fingers to be normal. (Id.) He also reviewed an x-ray of her knee taken the same day as the examination and noted that it revealed small osteophytes and some joint space narrowing, but no acute bone or joint abnormality. (Id. at 372.)

Two weeks after the consultative examination, medical consultant Dr. Calixto Aquino reviewed Trammell's file and completed a residual functional capacity ("RFC") assessment. (Id. at 378-85.) Dr. Aquino opined that Trammell can occasionally lift 20 pounds, stand, walk, or sit for about six hours in an eight-hour day, and is unlimited in her ability to push and pull. (Id. at 379.) Based on her knee pain, Dr. Aquino concluded that Trammell can only occasionally climb, kneel, crouch, or crawl. (Id. at 380.) In the "additional comments" section of his report, Dr. Aquino wrote that he found Trammell's pain allegations only partially credible. (Id. at 385.)

Nine months after Dr. Aquino's RFC assessment, in July 2010, Trammell fell on her left knee. (Id. at 409.) Dr. Rosenberg ordered x-rays, which revealed no fractures, but showed degenerative changes throughout her spine, most pronounced at the L5-S1 level. (Id. at 415-17.) The tests also revealed what the reviewing doctor described as "large marginal osteophytes" in her right knee and "small marginal osteophytes" in her left knee, consistent with radiographic osteoarthritis. (Id. at 417.) Two months later, in September 2010, Trammell submitted to MRIs on her knees, hips, and back. (Id. at 429-36.) Those tests showed moderate cartilage narrowing and osteophytes in her left knee, moderate to marked cartilage

narrowing and osteophytes in her right knee, mild degenerative hip changes, and mild disc space narrowing at the L5-S1 level of her back with minor disc bulges and mild to moderate central canal stenosis. (Id.)

In January 2011 Trammell was examined by Dr. Levin, a neurosurgeon. (Id. at 454.) He diagnosed her as having cervical radiculopathy, myelopathy, and lumbar spondylosis. (Id.) He noted that straight-leg testing revealed only low back pain and that her range of motion is diminished in her lumbar spine and cervical area. (Id.) Pursuant to his recommendation, Trammell underwent a cervical spine MRI a few days later. (Id. at 455-56.) That test confirmed the spondylosis diagnosis, revealing moderate narrowing at the C5-6 and C6-7 levels, but no spinal stenosis or cord impingement. (Id. at 456.) Based on his review of the MRI results, Dr. Levin recommended that Trammell receive steroid injections and begin physical therapy to help manage her pain. (Id. at 458.)

## B.     Trammell's Hearing Testimony

At her hearing before the ALJ, Trammell testified that she is disabled by "constant pain" in both knees. (A.R. 41.) Only lying down helps relieve her pain, although she also takes Motrin and Advil for relief. (Id. at 42.) Trammell said that because of her pain, she can only sit for 10 to 12 minutes at a time and stand or walk for only about 5 minutes. (Id. at 34-35.) She testified that her left arm hurts so badly that she is not able to lift anything with it, although she could lift the equivalent of a gallon of milk with her right. (Id. at 36-37.) Trammell said that it is very difficult for her to navigate stairs, so if she has to go to her basement to do

laundry, she stays near the machine until it is done.  (Id. at 37.)  Trammell said that she is able to drive, go shopping, prepare simple meals, and wash a few dishes. (Id. at 39-40.)  She lives with her daughter and two grandchildren, and she relies on them to help her with most household chores.  (Id. at 27, 39-40.)

Trammell also testified that she has pain in her left arm and rheumatoid arthritis in her thumb.  (Id. at 36, 41.)  She said that her left arm had been hurting all the time for over a year and that her doctors attribute her symptoms to degenerative disease in her neck and shoulders.  (Id. at 45-46.)  Trammell testified that the pain makes it difficult for her to type.  (Id. at 55.)

Trammell also described the nature of her past work as a data entry specialist at Merrill Lynch.  (Id. at 31.)  She testified that her job entailed picking up orders from various places in her office, requiring her to climb flights of 30 stairs and then enter the orders into a computer system.  (Id. at 31-34.)  She estimated that the job required her to be on her feet walking for 15 minutes out of every 30 minutes.  (Id. at 32.)  She spent the other half of her day sitting.  (Id. at 32-33.)

The ALJ questioned Trammell about her receipt of unemployment benefits following the July 2009 loss of her job.  When the ALJ first asked for how long Trammell received unemployment benefits, she said she received three months of benefits from her job, and "nothing" in 2010.  (Id. at 29.)  She then said that she thought she received $250 in benefits in January 2010.  (Id. at 30.)  When the ALJ said that it "looks like you received" $5,300 in the first quarter of 2010, $4,100 in the second, $6,100 in the third, and $5,700 in the fourth, Trammell conceded that

she received more than three months of unemployment and that she received those benefits throughout 2010. (Id.)

## C.    The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Trammell is not disabled under sections 216(i) and 223(d) of the Social Security Act. (A.R. 85.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [she] can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work. *Id.* § 404.1520(f),(g).

Here, at the first two steps of the framework the ALJ found that Trammell has not been employed since July 10, 2009, and that she has severe impairments consisting of bilateral knee pain and back pain secondary to osteoarthritis, hypertension, and asthma. (A.R. 79.) She did not include left-thumb pain among

the severe impairments because she noted that there are no medical records to back up Trammell's assertion that she has arthritis in her thumb and that there are no records suggesting that she had voiced that complaint to her treating physicians or the consulting examiner. (Id. at 79-80.) After determining that Trammell's impairments are not of Listing-level severity, the ALJ then turned to the RFC assessment and determined that Trammell has the RFC to perform a limited range of light work. (Id. at 80.) In explaining that decision, the ALJ discussed the objective medical findings, allotted great weight to the conclusions of the state agency consulting physicians, and concluded that Trammell's testimony was not credible. (Id. at 80-85.) Turning to step four, the ALJ concluded that Trammell is capable of performing her past relevant work as a data entry clerk. (Id. at 85.) Accordingly, she concluded that Trammell is not disabled within the meaning of the Social Security Act. (Id.)

## Analysis

In moving for summary judgment Trammell argues that the ALJ committed reversible errors in assessing her credibility, crafting her RFC, and classifying her past relevant work. This court's task in reviewing the ALJ's decision is to ensure that it is free of legal error and supported by substantial evidence. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). The substantial evidence standard requires the ALJ to "build an accurate and

logical bridge from the evidence to his conclusion," *see Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), but not necessarily to provide a thorough written evaluation of every piece of evidence in the record, *see Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). At this stage the court will neither reweigh the evidence nor substitute its own judgment for the ALJ's. *See Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008). Instead, the court limits its review to ensuring that the reasons articulated by the ALJ are adequately supported. *See Jelinek v. Atrue*, 662 F.3d 805, 811 (7th Cir. 2011).

## A.    The Credibility Analysis

Trammell challenges the ALJ's finding that her testimony regarding her limitations is less than credible. (A.R. 84-85.) The ALJ is entitled to special deference with respect to the credibility determination, because her ability to see and hear the claimant puts her in the best position to evaluate whether the claimant is being forthcoming. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The Seventh Circuit has made clear that reviewing courts "should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Accordingly, Trammell's burden here is particularly high because this court will not reverse an ALJ's credibility determination unless it is "patently wrong." *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

There is no need to linger on Trammell's argument that the ALJ's decision should be reversed because she invoked the oft-criticized boilerplate language

asserting that the "intensity persistence, and limiting effects of [Trammell's] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (A.R. 81.) Although it is true that this kind of "hackneyed language" adds nothing to the analysis, *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), the "simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [she] otherwise points to information that justifies his credibility determination," *Pepper*, 712 F.3d at 367-68. Where, as here, the ALJ gives a number of additional supported reasons to explain her credibility determination, use of the boilerplate does not amount to reversible error. *See Schomas*, 732 F.3d at 708; *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Trammell also argues that the ALJ erred in finding her "not credible based on her receipt of unemployment benefits in 2010." (R. 19, Pl.'s Br. at 11.) Trammell argues that it was error for the ALJ to hold this factor against her without considering whether financial desperation drove her to certify herself ready to work in her unemployment benefits application at the same time she was applying for disability benefits. (Id. at 11-12.) But here, it was not just the fact that Trammell applied for and received unemployment benefits that the ALJ held against her, but rather what the ALJ perceived as her caginess in responding to questions regarding those benefits. The ALJ was concerned that when asked about her receipt of unemployment benefits, Trammell "first testified she did not get these benefits, then said it was for three months, but, as noted above, computer records maintained

by the Administration show that she received benefits in 2010 and she then testified she got them throughout 2010." (A.R. 84-85.) The ALJ was entitled to find that Trammell's shifting answers with respect to this line of questioning detracts from her credibility, and her characterization of Trammell's testimony is supported by the transcript. (Id. at 28-30.) In any event, even if it were the act of certifying herself ready to work that the ALJ used to discredit Trammell, she was entitled to view that as among the factors to be balanced in weighing her credibility. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991).

Trammell next objects to the ALJ's discussion of her daily activities and conclusion that those activities are inconsistent with the level of pain she described at the hearing. (R. 19, Pl.'s Br. at 13-15.) But this is not a case where the ALJ primarily relied on the claimant's daily activities to discredit her symptom allegations or equated her ability to perform household tasks with the rigors of full-time work. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). Instead, the ALJ mentioned her daily activities in one sentence in the course of her lengthy discussion explaining why she found Trammell's allegations less than fully credible, stating that "[d]espite alleging constant knee pain, she continues to do chores around the house, including making simple meals and doing laundry every two to three weeks and shopping." (A.R. 84.) This small part of the ALJ's overall analysis makes clear that she did not conclude that Trammell can perform full-time work simply because she can prepare meals,

do laundry, and grocery shop. Rather, the ALJ explained that one of the many reasons she believed Trammell was exaggerating her pain is because the chores she described performing would be difficult to complete for someone who was truly experiencing the level of pain Trammell described. An ALJ is specifically charged with considering a claimant's daily activities in evaluating the credibility of her pain allegations, *see* SSR 96-7p, 1996 WL 374186, at *5 (1996); *Filus*, 694 F.3d at 869, and the ALJ reasonably discharged that duty here. Although reasonable minds might disagree over whether someone with Trammell's claimed level of pain could perform the chores she described, the ALJ's conclusion cannot be characterized as "patently wrong." *See Pepper*, 712 F.3d at 367; *see also Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (noting that "if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review").

Next Trammell faults the ALJ for stating in the course of her credibility analysis that "[t]here is no mention by any treating source of a need for, or recommendation for surgical intervention." (A.R. 84.) According to Trammell, this statement is improper because it suggests that the "ALJ's conclusions were founded on her own lay understanding of Ms. Trammell's impairments and her own unqualified knowledge of what treatment is appropriate." (R. 19, Pl.'s Br. at 15.) Although Trammell is correct that an ALJ is not permitted to "play doctor" and make independent medical conclusions regarding an appropriate course of treatment, *see Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), that is not what her comment reflects here. Her comment regarding the lack of evidence that

surgical intervention was ever considered comes on the heels of her long explanation of how Trammell's complaints are inconsistent with the medical record. The ALJ considered that Trammell had complained of knee pain for years before she stopped working because of a layoff and that she had experienced back and hip pain for the past year. (A.R. 84.) She highlighted records noting that Trammell reported a pain level of nine to a doctor on the same day that she did not appear to be in any distress and was walking with a normal gait. (Id.) She noted that Trammell reported improvements in her pain when she received cortisone injections. (Id.) The ALJ observed that Trammell treats her pain mostly with over-the-counter medications. (Id.) Only after this detailed discussion of the medical evidence did she observe the lack of recommendation for surgery. Because the comment was made in the course of a long credibility analysis, supported by the record, explaining why the ALJ found a mismatch between the objective record and Trammell's testimony, this is not a case where the credibility analysis hinges on an ALJ's rogue assumption of a doctor's role. *See Dixon v. Massanari*, 270 F.3d 1171, 1177-78 (7th Cir. 2001) (finding that ALJ did not "play doctor" where she "thoroughly discussed the medical evidence"). Accordingly, the sentence Trammell highlights does not provide a basis to reverse the ALJ's credibility analysis.

Finally, at least with respect to her challenge to the ALJ's credibility findings, Trammell argues that the ALJ erred in failing to explain her observation that Trammell's August 2009 complaint to Dr. Rosenberg that "her knees still bother her . . . is not consistent with a significantly limiting impairment." (A.R. 84;

R. 19, Pl.'s Br. at 12-13.)  Although it might be safe to assume that the ALJ meant to convey that a person with disabling pain likely would describe her pain in terms more emphatic than being "bothered," the court agrees with Trammell that the ALJ's failure to explain what she meant renders that one aspect of her credibility analysis unsupported.  That one error, however, is not enough to dismantle what is otherwise a thoroughly explained and well-supported credibility decision.  *See Simila*, 573 F.3d at 517 (noting that ALJ's credibility decision need not be "flawless" to survive judicial review); *Shramek*, 226 F.3d at 811 (noting that court's role is not to "nitpick" ALJ's credibility analysis).  Here the ALJ outlined why she believed Trammell's complaints to her doctors appear out of proportion to the doctors' observations, discussed her daily activities and medication side effects, and walked through why she believed Trammell was less than forthcoming in testifying regarding unemployment benefits.  (A.R. 84-85.)  Because the ALJ's credibility analysis is both reasonable and supported, this court will not disturb it.  *See Getch*, 539 F.3d at 483.

**B.      The RFC Assessment**

Trammell also argues that the ALJ improperly relied on the opinions of the state consulting physicians in determining that she has the RFC to perform a limited range of light work, because those opinions were rendered without the benefit of nearly a year's worth of more recent MRIs and other objective tests. Specifically, Trammell argues that MRIs conducted in July and September 2010, as well as diagnoses she received from Dr. Levin in January 2011, show that her

condition significantly deteriorated in the months after the consulting physicians submitted their report and RFC assessment. (R. 19, Pl.'s Br. at 8-9.) Accordingly, she argues that the ALJ was obligated to seek out updated medical opinions instead of relying on the input of doctors whose take on the case predated the new tests.

In arguing that the ALJ was required to obtain an updated medical opinion before determining her RFC, Trammell relies on a policy interpretation and case law that deal with the question of medical equivalency, rather than the RFC analysis, or involves an ALJ's incomplete analysis of existing evidence. Specifically, she relies on SSR 96-6p, but that policy interpretation states that an ALJ "must obtain an updated medical opinion from a medical expert" where

> additional medical evidence is received that in the opinion of the [ALJ] or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

SSR 96-6p, 1996 WL 374180, at *3-*4 (1996). That quote is specifically found under the heading "Medical Equivalence to an Impairment in the Listing of Impairments." *Id.* at *3. No such admonition is found in the "Assessment of RFC" section that follows. *Id.* at *4. The cases she cites also deal with medical equivalence or are otherwise distinguishable. In *Cirelli v. Astrue*, 751 F.Supp.2d 991, 1003-04 (N.D. Ill. 2010), the district court reversed the ALJ's decision because the claimant had received a Hepatitis C diagnosis after the state agency physicians reviewed the record, and the ALJ neither sought an updated evaluation nor any medical opinion before determining that his Hepatitis C was not equivalent to the listings. In

*Muhammad v. Astrue*, 585 F.Supp.2d 1023, 1033 (N.D. Ill. 2008), the district court remanded the case for an updated medical opinion under SSR 96-6p where the claim concerned a closed period of disability and the only medical opinion in the record was written in the middle of that period. Finally, in *Buckner v. Astrue*, 680 F.Supp.2d 932, 940 (N.D. Ill. 2010), the district court faulted the ALJ for prioritizing outdated consulting physician opinions over more recent treating physicians' opinions and not basing the RFC "on a complete review of all the relevant evidence." Because Trammell is not arguing that her impairments meet any of the Listings, nor has she pointed to any treating physician opinions that may have trumped the consulting physicians' opinions here, the law she has cited is of limited utility.

Importantly, SSR 96-6p only requires an ALJ to obtain an updated expert opinion where, in the ALJ's opinion, the new evidence might change the initial opinion. SSR 96-6p, 1996 WL 374180, at *4; *Buckhanon v.* Astrue, 368 Fed. App'x 674, 679 (7th Cir. 2010). Here, the ALJ considered the more recent test results at length in evaluating Trammell's RFC and gave no indication that she found them inconsistent with an RFC for limited light work. She explicitly discussed the July 2010 x-rays and noted that they showed knee osteophytes consistent with osteoarthritis but no evidence of degeneration in her hips. (A.R. 82.) She discussed the September 2010 MRI results and acknowledged that they showed cartilage changes in Trammell's knees and fraying in the meniscus and stenosis of the lumbar spine. (Id.) She noted that in a follow-up to those exams, Dr. Patel gave

Trammell a cortisone injection but noted no loss of strength, sensation, reflexes, or stability in Trammell's knees. (Id.) She also discussed Dr. Levin's January 2011 evaluation at length, noting his diagnoses of cervical radiculopathy, myelopathy, and lumbar spondylosis. (Id.) The ALJ noted that tests Dr. Levin ordered showed no spinal stenosis or cord impingement. (Id.) Thus there is no reason to think that the newer test results or Dr. Levin's diagnoses would have changed the ALJ's opinion. *See Hinton-Trigg on behalf of D.H. v. Astrue*, No. 1:12-CV-00010, 2013 WL 228240, at *8 (N.D. Ind. Jan. 22, 2013) (noting that "the relevant inquiry is the degree of claimant's limitations during the relevant period, not the diagnosis that she was assigned").

As the Seventh Circuit has made clear, "although ALJs bear some responsibility for developing the administrative record . . . they are also free to assume that a claimant represented by counsel has presented her strongest case for benefits." *Buckhanon*, 368 Fed. App'x, at 679. Where a claimant represented by counsel neither asks the ALJ to recontact the state-agency consultants nor submits any opinion from a treating physician, the "appropriate inference is that [the claimant] decided that another expert opinion would not help her." *Id.* Thus where, as here, the ALJ reviews the entire record and expressly relies on the uncontradicted opinions of state-agency consultants, that decision is supported by substantial evidence. *See id.*; *see also Filus*, 694 F.3d at 867 (noting that ALJ is entitled to accept state consulting physicians' opinions where no contradictory medical opinions in record); *Scheck*, 357 F.3d at 702 (observing that ALJ's duty to

make complete record "can reasonably require only so much" because "no record is 'complete'—one may always obtain another medical examination, [or] seek the views of one more consultant" (quotation and citation omitted)).

Trammell also argues that the RFC analysis is marred by reversible error because, she says, the ALJ failed to evaluate how her arm and hand pain limits her ability to work. She says that because her arm pain is a symptom of a diagnosed impairment—specifically radiculopathy and myelopathy—the ALJ erred in rejecting that evidence without providing a reviewable explanation. (R. 19, Pl.'s Br. at 10-11.) She further argues that Trammell's testimony regarding her difficulties with lifting and typing shows that her arm pain constitutes an outcome-determinative limitation that the ALJ overlooked.

Contrary to Trammell's argument, the ALJ did not overlook Trammell's arm pain; she explicitly discussed that limitation and concluded that it is not as severe as Trammell claims. At step three of the analysis, the ALJ declined to characterize Trammell's alleged thumb pain as a severe impairment, noting that she never mentioned that pain to any of her treating or consulting physicians and that there is no objective evidence supporting a conclusion that it constitutes a severe impairment. (A.R. 79-80.) In analyzing her RFC, the ALJ acknowledged that Trammell reported arm pain in her disability report and recognized that Dr. Levin had diagnosed radiculopathy and myelopathy. (Id. at 81-82.) But she also recognized that the state-agency physician found that she has no manipulative or fingering limitations and that objective tests showed she had full motor strength in

her upper extremities. (Id. at 82.) The only evidence Trammell points to suggesting that her arm pain interfered with her ability to function is her own testimony, but as discussed above, the ALJ gave ample reasons for her decision to discount that testimony. When the ALJ's decision is viewed as a whole, it is clear that she took into account the evidence of Trammell's arm and hand pain but reasonably concluded that her pain in those respects is not as limiting as she claims and is consistent with her RFC. For these reasons, this court finds that the ALJ did not commit reversible error in assessing Trammell's RFC.

## C.     Trammell's Past Relevant Work

Trammell's final challenge to the ALJ's decision comes in the form of her argument that the ALJ erred in characterizing her former job with Merrill Lynch as that of a data entry clerk and concluding that Trammell is capable of performing that work as generally performed in the economy. (R. 19, Pl.'s Br. at 17-18.) According to Trammell, that conclusion amounts to reversible error because her work at Merrill Lynch is actually a composite job made up of the elements of two or more occupations. (Id. at 18.) Trammell's attorney did not raise this argument during the hearing nor ask the ALJ to call a vocational expert to analyze her past relevant work. (See A.R. 23, 32-34, 57.) In fact, in his opening statement Trammell's attorney characterized her work as a "data entry employee," described how much walking her previous job entailed, then explained:

> I say that not because I feel that that's necessarily a vocational
> element for you to consider at the end of this, but to explain the reason
> why she has so many pains and why she probably has the level of pain

> and degeneration that she now experiences, because the job was
> arduous, specifically.

(Id. at 23.) In her briefs to this court, Trammell does not identify what distinct occupations comprised what she now describes as her past "composite job," but argues that because she engaged in significant walking and stair climbing at Merrill Lynch, her role there does not fit into the definition of data entry clerk as that work is generally performed.

In analyzing whether a claimant is capable of returning to her past relevant work the ALJ may consider the "actual functional demands and job duties of a particular past relevant job" *or* the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61, 1982 WL 31387, at *2 (1982); *see also Steward v. Bowen*, 858 F.2d 1295, 1299-1300 (7th Cir. 1988). Where a claimant can perform only one or two tasks associated with her previous jobs, the first of these two inquiries must be resolved in her favor. *Valencia v. Heckler*, 751 F.2d 1082, 1087 (9th Cir. 1985). Moreover, where a claimant's past work "has 'significant elements of two or more occupations,'" that work consists of a "composite job" and "must be 'evaluated according to the particular facts of each individual case.'" *Garcia v. Colvin*, No. 12 CV 4191, 2013 WL 3321509, at *11 (N.D. Ill. June 28, 2013) (quoting SSR 82-61, 1982 WL 31387, at *2 (1982)). Where the claimant's past work consists of a composite job, "an ALJ may not deem a claimant capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and finding . . . her capable of performing the less demanding of the two jobs." *Peterson*

*v. Astrue*, No. 1:09 CV 00209, 2010 WL 3219293, at *7 (N.D. Ind. Aug. 12, 2010) (internal quotation and citation omitted). In other words, the ALJ's conclusion that a claimant is not disabled should not be based on her ability to perform only a subset of her past relevant work. *See id.*

Here, Trammell has made no attempt to describe what distinct occupations go into what she characterizes as her composite past work, instead focusing in on the peculiarities of how she performed her job under the conditions present at her particular former employer. Specifically, to show that her work does not qualify as the work of a data entry clerk as generally performed she relies on the fact that the office where she worked was spread out onto many floors of office space requiring her to climb stairs throughout the day as she picked up and delivered orders. (R. 19, Pl.'s Br. at 17.) But she does not argue that the level of climbing and walking she described is characteristic of data entry work as generally performed, or that those aspects of her past relevant work are part of some separate occupation that the ALJ should have brought into her analysis. Past relevant work is a term that "refers to the type of job, not to idiosyncratic duties that the employer may have imposed." *Hughes*, 705 F.3d at 279 (citing 20 C.F.R. § 404.1560(b)(2)); *see also Orlando v. Heckler*, 776 F.2d 209, 215 (7th Cir. 1985) (noting that past relevant work analysis does not require ALJ to consider whether claimant can "return to his specific past relevant job"). Based on Trammell's own testimony, the level of stair-climbing she was required to perform at her past job was a product of her former office's layout, not of some separate occupation that she performed as part of her

data-entry work. The question the ALJ faced was not whether Trammell could return to her specific job in that particular office environment, but whether she "can return to a 'job' [s]he held that exists at other employers." *See Smith v. Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004); *see also Getch*, 539 F.3d at 482 ("In other words, the ALJ need not conclude that the claimant is capable of returning to the precise job he used to have; it is enough that the claimant can perform jobs substantially like that one."). Because the ALJ reasonably explained why she believes Trammell is capable of performing the work of a data entry clerk as it is generally performed, this court concludes that her decision is supported by substantial evidence.

## Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is granted, Trammell's is denied, and the decision of the Commissioner finding that Trammell is not disabled within the meaning of the Social Security Act is affirmed.

**ENTER:**


_____
**Young B. Kim
United States Magistrate Judge**